James Alvin PARISH, Appellant,

v.

STATE of Texas, Appellee.

No. B14–81–488–CR.

Court of Appeals of Texas, Houston (14th Dist.).

May 27, 1982.

Lewis Dickson, Houston, for appellant.

Ray Speece, Houston, for appellee.

Before JUNELL, MURPHY and SAM ROBERTSON, JJ.

SAM ROBERTSON, Justice.

The jury rejected appellant's plea of not guilty to the charge of solicitation of capital murder and assessed his punishment at ten (10) years confinement. Appellant bases his appeal upon nine grounds of error. However, since we must reverse upon his first ground asserting insufficient evidence, only it need be addressed.

The indictment, omitting its formal parts, alleged that appellant did

with intent that capital murder be committed, *request, command, and attempt to induce* Ed Turner to intentionally and knowingly cause the death of W.H. Elliott for remuneration and promise of remuneration, namely, an automobile. (emphasis added).

Viewed in the light most favorable to the verdict, the jury could have believed the following from the evidence. W.H. Elliott, a Lieutenant in the Houston Police Department, had just been promoted from a detective in the "fence detail." While in that assignment he had investigated, with some successful results, a car theft ring in which a Steve McMillan was involved. During the investigation, Elliott had caused appellant, accompanied by his attorney, to come to his office and give a statement. Shortly thereafter, McMillan contacted Elliott and informed him he had heard appellant was attempting to locate Elliott's home address. Elliott desired to know the reason, and for this purpose instructed McMillan to set up a meeting. Prior to the meeting, a transmitting device was attached to McMillan's body so that the conversations between McMillan and appellant could be intercepted and recorded. Portions of this lengthy recording were admitted before the jury and the tape is before this court and has been listened to. Additionally, a transcription of the tape is before this court. While portions of the conversation are impossible to understand, that causes no major concern. What is of major concern is the actual content of the conversation or the words spoken and the weight that can be given to them. While both Elliott and McMillan testified before the jury,[1] we are still bound by the conversations as reflected on the tapes. In this regard, efforts by the state to have the witnesses "interpret" what was said by appellant and McMillan are questionable, since the tapes were admitted in evidence and the jury listened to them. We think it

appropriate to point out that the tapes contain talk so offensive that both the prosecutor and defense counsel, in effect, apologized to the jury. Yet the prosecutor stated, in effect, that the language used and the tone of the voices was strong evidence of the facts necessary for conviction. It is for this reason that when quoting portions of the tape, effort has been made to quote verbatim.

To place the matter in proper prospective, the tapes contain extremely lengthy conversations about everything imaginable but almost nothing of any plan to kill Elliott. Looking to the taped conversation on December 3rd, absolutely the most that could be said is that from this conversation between McMillan and appellant the jury could believe appellant's connection with the auto theft ring was still under investigation, that a 36 year old "guy" who had "spent nineteen years in the penitentiary" for "killing somebody" had told appellant that he understood "a cop" was giving appellant a bad time and wanted to know if it was a certain one, and that when appellant told him "there is two of them," the man said "find out where they live." The tape then reflects that McMillan said words to the effect "well, that's the reason, o.k., well I'll tell you what happened. I was talking to Charlie, and he said you were looking for him to do a deal on him. I've got the man to handle it.[2] He's already handled the job for me.... He handled ... Anita's ex-husband...." Appellant then stated "I know one thing, he lives out north.... He lives in a townhouse with another cop.... Hey, it won't take long; I'll find him. I'm working on the phone number right now and I think I finally got a right number to reach him at.... Allright, if I can get a right number, I got an aunt that works for the phone company.... All I got to do is give her the phone number and she gives me the address where the phone is installed." McMillan then stated "Do you want to

---

1. Elliott testified to what he heard by way of the transmitted messages, and McMillan testified to the conversation he had in person with appellant.

2. So that there would be control of the situation, Lt. Elliott had already instructed McMillan to use his efforts to make the supposed killer available to appellant.

let this cat take care of it," and appellant answered "It don't matter. I don't care." Appellant then stated that he didn't like the way everybody "got fucked over" and although "I didn't get in no big trouble over it. . . . its cost me quite a sum of money." While there was further extended conversation, nothing pertained to the subject of this charge.

On December 6, appellant and McMillan again met and by means of a hidden transmitter on McMillan, the conversations were recorded. The jury heard this recording, and it, likewise, is before this court. Like the December 3rd recorded conversation, this one also contains rambling conversations between appellant and McMillan. At one point, McMillan apparently attempts to direct the conversation to the subject of this prosecution when he asks appellant "oh, what was that you were talking about the other night," and appellant replies "what was that." McMillan responds "you said something about you had another E E deal or E deal or something man—something you wanted to tell me." Appellant said "you said you were bringing your negro back. . . . another one of them deals—somebody wants somebody disposed of." McMillan asked "is it within our group or somebody else" and appellant responded "somebody else." The conversation rambled onto other subjects and finally McMillan stated "I thought I'd give you a holler tomorrow afternoon" and appellant responded "If you need to give him two, three days, a week, whatever, just go ahead." McMillan then stated "alright, me and my big negro will come see you tomorrow afternoon probably; you'll like him." Appellant asked "what did he cost you to dispose of somebody;" McMillan responded "5." Appellant stated "that ain't bad." McMillan told appellant he would go in "halfsies on this deal," and appellant told McMillan that the intended target was not a "relative" but "the old lady wants to get rid of the old man."

On December 7th, McMillan, Turner [3] and appellant met. Again these lengthy con-

versations were recorded and played for the jury. After all three had been talking for some time about various subjects, the following transpired:

TURNER: Well, not to change the conversation but what do we want to do?

McMILLAN: My man is business.

APPELLANT: Yeah, o.k.

\*    \*    \*    \*    \*    \*

McMILLAN: We will know tonight where Elliott's at.

APPELLANT: I'll be glad when (unintelligible) gets back, I want to fuck with him. I want to fuck with him bad.

McMILLAN: Who.

APPELLANT: I'll be glad when (unintelligible) gets back.

The subject then changes, but within a very short time, the following conversation occurs:

TURNER: How do you want to leave this son of a bitch?

APPELLANT: I don't care how you leave him, I'll ask her. Want him gone forever, I know that.

McMILLAN: Are you talking about, you talking about this other character or are you talking about E, Elliott?

APPELLANT: No, I'm talking about this other character.

McMILLAN: You don't want, I mean you don't want to do a deal on—

APPELLANT: On Elliott?

McMILLAN: Yeah.

APPELLANT: I don't care.

McMILLAN: O.K. Well let's just pass on that then.

APPELLANT: Don't matter, however you want to do it cause right now my man ain't here.

TURNER: O.K. The deal was Elliott, right?

McMILLAN: That's right, alright. Well, lets just; I'll set up the deal. I'll talk to Ed about this other one. I thought he wanted to move on Elliott but I don't know.

---

3. Lt. Elliott had made arrangements with Ed Turner to play the part of the contract killer

referred to by McMillan in his conversation with appellant.

APPELLANT: (Unintelligible) is in Mexico.

McMILLAN: Who's that?

APPELLANT: The guy that was going to do it for me.

McMILLAN: Do you want to wait until he gets back and do it then?

APPELLANT: Don't matter, however you want to do it. If you want to do it now, do it. We can pass on the other deal and use that for something else. I don't care.

TURNER: Well, do you want to do, you want to do Elliott or what. It don't make me no fuckin difference.

APPELLANT: That's a good place to start.

McMILLAN: Well—

TURNER: I don't like them mother fuckers anyway. I'm gonna be honest with you. I ain't got no love lost for them mother fuckers, brother.

APPELLANT: Hey man, about that. They cost these guys a ton of money, you know, but they cost me a ton of money, too.

TURNER: Well, don't think they hadn't cost me.

APPELLANT: Well, I'm sure they have. Ain't nobody (unintelligible) this mother fucking cop like I do.

TURNER: Let me tell you something. The reason I'll do it for five. I wouldn't kill a fucking roach for $500, cause of him and like I say, I'll—anyway you want to leave him. You know, if you want him breathing I'll leave him breathing, hey, if you don't, he—

APPELLANT: Ain't no use wasting good air—finish it.

TURNER: That's right—The way you handle for five, take two up front. You meet me back here and get the rest, but like I say, the only reason I'm gonna do him is because of him.

APPELLANT: I understand.

TURNER: And I'm gonna leave town Sunday and I'd like a fucking ticket to New Orleans and I'll go over there and fuck off till things cool down, and if necessary, hey, I'll bring anything off of him you want me to. If he's got a ring, whatever, I'll bring his fucking I.D.

APPELLANT: I don't want it.

The conversation lapses into other subjects and, finally, the following transpired:

TURNER: So what do you all want to do, I've got a little thing I'm gonna go do.

APPELLANT: I'll let you know something on that other deal tomorrow. I'll find out something here in a little bit.

McMILLAN: Alright. Alright, well what do you want to do, Jim, do you want us to go ahead and run him down tonight?

APPELLANT: Who, Elliott?

McMILLAN: Yeah.

APPELLANT: Might as well.

McMILLAN: O.K.

APPELLANT: You know, if you're going to do it, just do it all at one time and leave, cause I know he don't want to be hanging around. That's a bad deal if you hang around. You're caught.

Again the conversation drifts off into other subjects, and returns as follows:

APPELLANT: I'm gonna get my heap out of here before somebody recognizes it, shit.

TURNER: Alright, somebody tell me something before I boogie.

McMILLAN: Like I say, I don't know— are you just BS ing or do you want it handled?

APPELLANT: That guy I was talking about?

McMILLAN: No, Elliott.

APPELLANT: Elliott, I'd like to see him go.

McMILLAN: I mean like (unintelligible) and all that shit right now, if you want it done, Ed can handle it. You know there's nobody else I know that would handle a contract.

APPELLANT: I don't know whether I can handle 'em both this weekend.

McMILLAN: Both?

APPELLANT: Yeah, the other one too.

McMILLAN: Well, don't worry about it a (unintelligible).

TURNER: I can do that later, one at a time, you know.

McMILLAN: Well, I didn't think you were involved in this other one. This other deal.

APPELLANT: I ain't, but I am.

McMILLAN: Oh, o.k., alright.

TURNER: Like I say. Two up front and three on completion and get my ass out of town. Like I say, it's because of him. I wouldn't kill a roach for $500 and a cop—fuckin money.

McMILLAN: A $14,000 car out there.

TURNER: This fucker is like a brother to me.

APPELLANT: Sell the Mustang and see what you can get out of it. What do you think you can get for it?

McMILLAN: A thousand, at least.

APPELLANT: You can get a grand for it, that's fine. That will pay for two of them.

The next day McMillan, Turner and appellant again met and the conversations were again taped. Like all the other conversations, these rambled from one subject to another. While these conversations can hardly be probative evidence of appellant requesting, commanding or attempting to induce Turner to kill Elliott, the state relied heavily upon these *events* in proving its case. During these conversations appellant stated that he had been unable to contact "the gal that wanted her old man killed" and therefore didn't know what she wanted to do. It was further agreed that rather than wait for the Mustang automobile to be sold so that Turner could be paid in cash, Turner would just accept the Mustang as payment. Turner was to kill Elliott early the next morning and deliver his personal belongings to appellant. Appellant was to purchase an airplane ticket to New Orleans for Turner and deliver the Mustang automobile to McMillan's garage.

The prosecution presented additional evidence that appellant did purchase the airline ticket and give it to Turner the next day; appellant did deliver the Mustang automobile and place it in McMillan's garage and Turner turned over to appellant Elliott's police badge, identification and jewelry. As appellant left McMillan's house, he was arrested, and all Elliott's property which had just been delivered to him was recovered.

Appellant relies heavily upon the panel decision of the Court of Criminal Appeals in *Schwenk v. State,* No. 61,084 (Tex.Cr. App., Oct. 28, 1981). That case is presently pending before the full Court of Criminal Appeals on State's Motion for Rehearing, and it is obviously unknown how much, if any, of the panel opinion will be adopted by the Court. We do not, therefore, feel comfortable in basing our decision upon the reasoning there enunciated.

Looking at the facts as they have been set out above, we hold that the evidence is insufficient as a matter of law to show that appellant requested, commanded or attempted to induce Ed Turner to cause the death of W.H. Elliott. Having so decided, it is our duty to reverse the judgment of conviction and order the entry of a judgment of acquittal.

It is so ordered.